UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATELYNN HAYES,

      Plaintiff,                 Civil Action No. 18-10488

         v.                 District Judge Sean F. Cox
                              Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging Defendant Commissioner's ("Defendant's") denial of her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #22] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #19] be DENIED.

-1-

## PROCEDURAL HISTORY ,

On November 4, 2014, Plaintiff applied for SSI, alleging disability as of July 8, 2013[1] (Tr. 172).  Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on February 21, 2017 in Detroit, Michigan (Tr. 30).  Administrative Law Judge ("ALJ") Carol Guyton presided.  Plaintiff, represented by non-attorney representative Dannelly C. Smith, testified (Tr. 35-50), as did Vocational Expert ("VE") Diane Regan (Tr. 50-54).  On June 26, 2017, ALJ Guyton found that Plaintiff was not disabled (Tr. 11-22).  On December 14, 2017, the Appeals Council denied review (Tr. 1-4).  Plaintiff filed suit in this Court on February 12, 2018.

## BACKGROUND FACTS

Plaintiff, born October 29, 1993, was 23 at the time of the administrative determination (Tr. 22, 172).  She graduated from high school and completed one year of college (Tr. 212).   She alleges disability due to left ear deafness, right ear hearing limitations, pituitary gland problems, syncope, anxiety, depression, migraines, and balance problems (Tr. 211).  Her application for benefits states that she worked previously as an assembler, bartender, cashier/baker, and food worker (Tr. 213).

### A.  Plaintiff's Testimony

Plaintiff stood 5' 6" and weighed 110 pounds (Tr. 35).  She was right-handed and single (Tr. 35).  She had a three-year-old son (Tr. 36).  She had been living in a house with

---

[1]Plaintiff later amended her alleged onset of disability date to December 4, 2013.

her boyfriend and son for the past four months and before that, at her parents' house (Tr. 37). She held a driver's license but had not driven since 2012 due to health issues (Tr. 38). Due to health problems, she had been unable to finish two online college courses (Tr. 38). In high school, she was placed in special education but took regular classes (Tr. 39). Before the alleged July, 2013 onset of disability, she was doing assembly line work (Tr. 39). She stopped working because she was "passing out and getting sick" (Tr. 39).

She was unable to work due to constant dizziness (Tr. 40). She passed out multiple times a day and experienced migraines, nausea, anxiety, and depression (Tr. 40). She took medication for anxiety, sleeplessness, headaches, and nausea (Tr. 40). At worst, she experienced level "nine" headaches on a scale of one to ten (Tr. 41). She was hospitalized for migraines for a total of a month in the last quarter of 2013[2] (Tr. 41). She did not use a cane (Tr. 42). She did not smoke or use alcohol or illicit drugs (Tr. 43). She was unable to sit for more than 10 minutes before experiencing anxiety and nausea (Tr. 43). She was unable to stand for more than 10 minutes or walk for more than half a block (Tr. 43). Lifting was limited to less than 15 pounds (Tr. 43). She did not experience problems using her hands (Tr. 44).

On a typical day, she spent most of her time reclining (Tr. 44). She required help getting dressed (Tr. 44). She took baths rather than showers (Tr. 44). She was unable to perform laundry chores or make meals (Tr. 44). She had been with her boyfriend for around

---

[2]The treating notes indicate that the hospitalization was in 2012.

one year (Tr. 44).  She was generally unable to care for her child, but could feed him on a sporadic basis (Tr. 45).  She experienced dizziness "all day, every day" (Tr. 46).  When she experienced dizziness, she had to sit down immediately to avoid fainting (Tr. 47).  She experienced headaches anywhere from five to six hours every day (Tr. 47).  She passed out three to four times a day and was unconscious for up to thirty seconds at a time (Tr. 48).

Plaintiff admitted to past heroin use but stopped using in 2012 (Tr. 49).  She had not used heroin since her son was born in 2013, and denied that her boyfriend used heroin (Tr. 50).  She stated that due to her condition, she had never been without supervision in the past three years (Tr. 54).

### B.  Medical Evidence[3]

### 1.  Treating Sources

In September, 2012, Plaintiff sought emergency treatment for headaches and nausea (Tr. 272).  She appeared cooperative and fully oriented (Tr. 273).  A CT of the brain was unremarkable (Tr. 274, 279, 292).  Hospital records note that Plaintiff was possibly "going through withdrawals" (Tr. 274).  Plaintiff reported that she "had been under increased stress recently" (Tr. 276).  She reported that she had not used heroin in one month (Tr. 277).  She exhibited good coordination and a steady gait (Tr. 278, 282).  Later the same month, she was admitted for inpatient care due to headaches and fever (Tr. 298).  CT and MRI studies of the

---

[3]Medical records predating the amended alleged onset date of December 4, 2013 are included for background purposes only.

head/brain showed an enlarged pituitary gland and ear infection (Tr. 298, 330, 401). Plaintiff was transferred to another hospital for a neurological evaluation (Tr. 299). She reported "off and on" heroin use, occasion use of alcohol, and smoking five cigarettes a day (Tr. 301). She appeared alert and fully oriented (Tr. 314). In November, 2012, Plaintiff underwent surgery for the removal of vent tubes (Tr. 336, 344). An ophthalomolgical examination from the same month noted that the pituitary adenoma did not create visual complaints (Tr. 661).

A February, 2013 MRI of the brain showed abnormalities of the left cochlea (Tr. 351). The "[f]ullness" of the pituitary gland was deemed "likely physiologic" (Tr. 351). In July and November, 2013, neurologist Karim M. Fram, M.D. noted Plaintiff's report of three to four headaches a week lasting for up to four hours, accompanied by nausea, vomiting, and dizziness (Tr. 424-426). Plaintiff exhibited a normal gait (Tr. 425). A neurological examination was unremarkable (Tr. 424). Plaintiff appeared alert and fully oriented (Tr. 425). She was diagnosed with muscle tension headaches and advised to take multivitamins and Excedrin (Tr. 424).

In July, 2014, Seema Doshi, M.D. noted that Plaintiff was healthy and in no acute distress (Tr. 373). Plaintiff reported that the headaches were stable (Tr. 373). October, 2014 treating records by Dr. Doshi note that Plaintiff denied nausea or fainting (Tr. 372). November, 2014 records by Jack P. Rock, M.D. note the condition of a "pituitary tumor" and that Plaintiff reported "blackouts, dizzy spells, and headaches" (Tr. 357). In January, 2015, Dr. Rock noted that the presence of a "small lesion" of the pituitary gland but opined that the

reported headaches were not caused by the lesion (Tr. 354). Plaintiff reported dizziness but not light-heatedness (Tr. 352).

Notes by Blue Water Counseling from the same month note Plaintiff's report of depression, anxiety, and struggles with drug use (Tr. 361). The following month, she reported that she got along well with her family, but had become pregnant while in a rehabilitation facility (Tr. 362). She did not use heroin during the pregnancy but began using again when her son's father "got out of jail" (Tr. 362). She reported the loss of hearing in her left ear due to a 2012 virus and chronic headaches, dizziness, and nausea (Tr. 362, 392, 398). She exhibited intelligence and good personal care habits but was deemed "impulsive" (Tr. 362). She was assigned a GAF of 54 due to depression, anxiety, hearing loss and headaches, and social problems (Tr. 365-366). She reported that she had been "clean" for three weeks[4] (Tr. 367). In April, 2014, she discontinued counseling "against advice" (Tr. 606).

September, 2015 records by Igor Nedic, M.D. note the conditions of depression and opioid dependence (Tr. 565). Plaintiff exhibited a normal gait and station (Tr. 564). A mental examination status was unremarkable (Tr. 564). The following month, she reported headaches (Tr. 550). Dr. Nedic's notes from November, 2015 note that Plaintiff wanted

---

[4]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000) ("*DSM-IV-TR*"), 34.

"paperwork filled out stating that she can't work" (Tr. 544). December, 2015 records note the conditions of headaches and depression (Tr. 537). Plaintiff reported "memory" issues (Tr. 537).

January, 2016 treating records by Adam Robin, M.D. note Plaintiff's report of continued headaches and dizziness when standing (Tr. 623). Plaintiff appeared fully oriented and alert with good concentration and memory (Tr. 625). She exhibited a normal gait (Tr. 626). February, 2016 records by Dr. Nedic note a normal appearance and gait with an unremarkable mental condition (Tr. 526-527). In March, 2016, Plaintiff reported "a reasonably good month" (Tr. 520).

Blue Water counseling records from the next month note that Plaintiff's depression was deemed "moderate" (Tr. 601). Plaintiff reported stress due to an "inoperable" brain tumor and was "in constant pain" and anxiety about being disabled at "such a young age" (Tr. 599). Plaintiff reported stress in the relationship with her boyfriend due to housing problems (Tr. 592). Dr. Nedic's May, 2016 records note depression and anxiety but no suicidal thoughts (Tr. 511). Later the same month, Plaintiff reported "weakness, numbness, dizziness, headaches/migraines, and restless legs (Tr. 503). Dr. Nedic's July, 2016 records note a normal appetite and muscle aches without weakness (Tr. 473). Plaintiff reported anxiety but denied depression (Tr. 473). Treating notes from the next month note that Plaintiff was "very upset" about a custody battle with her estranged boyfriend (Tr. 471). Counseling records also note that Plaintiff was shaken by her grandmother's death and her

-7-

boyfriend's infidelity (Tr. 587). She reported feeling dizzy when rising quickly (Tr. 586). (Tr. 577-584). Dr. Nedic's November, 2016 records note a denial of migraines but sadness over her grandmother's death (Tr. 453). Notes from the next month note Plaintiff's report of "vertigo with falling" and "intractable headaches" (Tr. 450).

January, 2017 records note that problem areas included depression and headaches (Tr. 433, 440). Plaintiff's occupation was listed as "home daycare" (Tr. 440). Blue Water counseling records from the same month note a depressed mood, tearfulness, hopelessness, and fears of separation (Tr. 618). Plaintiff exhibited a normal memory, an appropriate affect but "immature" judgment and limited insight (Tr. 616). She reported a history of stealing from her parents during a recent drug relapse and cashing illegal checks for her ex-boyfriend at her aunt's restaurant (Tr. 615). She admitted that she continued to communicate with and visit the ex-boyfriend (Tr. 615). She was assigned a GAF of 50 due to depression, anxiety, problems with her primary support group, social environment, occupational problems, economic problems and "psychosocial and environmental problems"[5] (Tr. 618).

February, 2017 records by Dr. Nedic note Plaintiff's report of "presyncopal" episodes (Tr. 444). The same month, Dr. Nedic completed an assessment of Plaintiff's work-related activities, noting the conditions of severe headaches, depression, hypotension, and nausea (Tr. 429). He noted the symptoms of photophobia and "hypotensive episodes" (Tr. 429). He

---

[5] A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV–TR* at 34.

reported that Plaintiff's condition made "no significant improvement" with medication (Tr. 429). He found that Plaintiff's conditions would interfere with her attention and concentration "constantly" and that she was incapable of even low stress jobs due to intractable constant headaches (Tr. 430). He found that she was unable to walk less than half a block, sit for more than 15 minutes, or stand for more than five (Tr. 430). He found that she was incapable of sitting, standing, and walking for even two hours in an eight-hour workday (Tr. 431). He limited her to lifting 10 pounds and moving her neck on a rare basis (Tr. 432). He precluded all climbing of ladders but found that she could crouch/squat and use stairs rarely and twist and stoop occasionally (Tr. 431). He found that Plaintiff would be expected to have consistently "bad" days and that she was unable to work even one day a month (Tr. 432).

### 2. Non-Treating Sources

In March, 2015, Mark Garner, Ph.D. performed a non-examining review of the treating records, finding that Plaintiff experienced mild restriction in activities of daily living and moderate difficulty in social functioning and concentration, persistence, or pace (Tr. 64, 67-69).

### C. Vocational Expert Testimony

The ALJ posed the following question to VE Diane Regan, describing a hypothetical individual of Plaintiff's age, education, and lack of work history:

[T]hey do not have any exertional limits, but they do need some other limits, more environmental and mental, in that this person is not able to climb ladders,

-9-

ropes, or scaffolding, or be exposed to hazardous machinery or unprotected heights.  There's no more than moderate exposure to noise, and they're limited to unskilled work, which consists of simple, routine tasks involving no more than simple, short instructions, and simple work-related decisions with few work place changes.  There's to be no contact with the general public, and occasional contact with co-workers [and] supervisor(s).

The VE testified that given the above limitations, the individual could perform the unskilled, exertionally medium work of a packer (300,000 jobs in the national economy) and exertionally light work of a sorter (150,000) and assembler (300,000)[6] (Tr. 52).   The VE testified further that the same individual could perform the unskilled, sedentary work of an inspector (100,000); assembler (150,000); and packer (80,000) (Tr. 52).

The VE stated that if the individual were incapable of even low stress jobs, limited to sitting, standing, or walking less than two hours in an eight-hour workday, all competitive employment would be eliminated (Tr. 52).   She testified that if the individual had "inconsistent" concentration, required unscheduled breaks, or was off task 20 percent or more of the workday, all competitive employment would be eliminated  (Tr. 53).  The VE stated that her testimony was consistent with the information found in the *Dictionary of*

---

[6]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

*Occupational Titles* ("*DOT*"), noting that her testimony pertaining to being off task and the need for breaks was based on her own professional experience (Tr. 53).

### D.     The ALJ's Decision

Citing the medical records, ALJ Guyton found that Plaintiff experienced the severe impairments of "migraine headaches; sensorineural hearing loss; neoplasm of the pituitary gland; hypotension; major depressive disorder; and anxiety disorder" but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 13-14).  She found that the conditions of scoliotic spinal curvature and opioid dependence (in remission) were non-severe (Tr. 13).  She found that Plaintiff experienced moderate limitation in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself (Tr. 14-15).  The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for sedentary work with the following non-exertional limitations:

> She cannot climb ladders, ropes or scaffolds.  Claimant cannot work around hazardous machinery or at unprotected heights.  Claimant can tolerate no more than moderate noise exposure.  She is restricted to simple, routine tasks involving no more than simple, short instructions and simple work related decisions with few work place changes.  Claimant can have no contact with the general public.  She can have occasional contact with coworkers and supervisors (Tr. 16).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the sedentary, unskilled work of an inspector, assembler, and packer (Tr. 21-22, 52).

The ALJ discounted the allegations of disability.  She accorded "little weight" to Dr.

Nedic's February, 2017 opinion that Plaintiff was unable to sit, stand, or walk for more than two hours in an eight-hour workday (Tr. 20).  She noted that the opinion was unsupported by clinical findings, objective imaging, laboratory data,  or the record as a whole (Tr. 20). The ALJ observed that many of Plaintiff's  psychological problems were "situational, typically directly related to difficulties in her relationship with her son's father" (Tr. 20).

The ALJ cited the third part report by Plaintiff's father, noting his observation that Plaintiff's ability to follow instructions depended on how the day was going (Tr. 15).  She acknowledged his observation that Plaintiff was able to "do housework with encouragement, even if it took her a long time," but was unable to pay attention for more than 10 minutes (Tr. 15).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.

1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).  The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATION

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-13-

## ANALYSIS

### A. Dr. Nedic's Opinion

Plaintiff argues first that the ALJ erred by failing to "evaluate" Dr. Nedic's February, 2017 assessment of the physical and mental limitations. *Plaintiff's Brief,* 4-8, *Docket #19,* Pg ID 740. She points out that Dr. Nedic's treating assessment is the only medical opinion in the transcript regarding her limitations, arguing that the RFC reflecting a lessor degree of limitation is improperly based on the ALJ's "lay opinion." *Id.* at 8-20.

Case law in effect at the time of his application requires that "if the opinion of the claimant's treating physician is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. CSS*, 378 F.3d 541, 544 (6th Cir. 2004)); 20 C.F.R. § § 404.1527(c), 416.927(c); *see also* SSR 96–2p, 1996 WL 374188, at *5 (July 2, 1996).[7] However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings, *Warner v. Commissioner of Social*

---

[7] The administration rescinded SSR 96-2p on March 27, 2017. *See Rescission of Social Security Rulings* 96-2p, 96-5p, and 06-3p, 82 FR 15263-01 (Mar. 17, 2017). Under the new rules, ALJs will weigh both treating and non-treating medical evaluations based on how well they are supported by the remainder of the record. 20 C.F.R. §§ 404.1520b; 416.920c. The "new rules, however, apply only to claims filed on or after March 17, 2017." *Hancock v. Commissioner of Social Security*, 2017 WL 2838237, at *8 (W.D. Mich. July 3, 2017)(*citing Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01 (Jan 18, 2017) ). Because current Plaintiff filed his claim well before March 17, 2017, SSR 96-2p would apply.

*Sec.*, 375 F.3d 387, 391-392 (6th Cir. 2004), provided that he supplies "good reasons" for doing so. *Wilson*, at 547; 20 C.F.R. §§ 404.1527(c), 416.927(c); SSR 96–2p, at *5. In explaining the reasons for giving less than controlling weight to the treating physician's opinion, the ALJ must consider (1) "the length of the ... relationship" (2) "frequency of examination," (3) "nature and extent of the treatment," (4) the "supportability of the opinion," (5) the "consistency ... with the record as a whole," and, (6) "the specialization of the treating source." *Wilson*, at 544.

As discussed above, Dr. Nedic opined that due to severe headaches, depression, hypotension, and nausea with symptoms of photophobia and "hypotensive episodes," Plaintiff was unable to perform any full-time work (Tr. 429-432). He stated that Plaintiff's conditions made "no significant improvement" with medication; her conditions would interfere with her attention and concentration "constantly;" and she was incapable of even low stress jobs due to intractable constant headaches (Tr. 429-430). Dr. Nedic also found that she was unable to walk more than half a block, sit for more than 15 minutes, or stand for more than five (Tr. 430-431). He found that she was incapable of sitting, standing, and walking for even two hours in an eight-hour workday (Tr. 430-431). He limited her to lifting 10 pounds and moving her neck on a rare basis (Tr. 432). He precluded all climbing of ladders but found that she could crouch/squat and use stairs rarely and twist and stoop occasionally (Tr. 431). He found that Plaintiff would be expected to have consistently "bad" days and was unable to work even one day a month (Tr. 432).

-15-

The ALJ acknowledged all of the limitations found by Dr. Nedic (Tr. 20). She noted the presence of a "treating" relationship, remarking that Plaintiff received treatment from August, 2015 forward and that Dr. Nedic prescribed medication in response to the complaints of headaches (Tr. 19-20). However, the ALJ accorded "little weight" to Dr. Nedic's opinion (Tr. 20). She noted that opinion was made in a "form statement" (Tr. 20). She noted that the "specific restrictions" were not supported by his own clinical findings, imaging studies, or the transcript as a whole (Tr. 20). She found that Dr. Nedic "presumably lack[ed] vocational qualifications to assess the effects of claimant's impairments [or] access to different vocational options or scenarios," noting that Dr. Nedic's statement that Plaintiff was disabled from all work was a determination reserved to the Commissioner  (Tr. 20, 432).

Contrary to Plaintiff's contention, the ALJ's accord of only little weight to Dr. Nedic's opinion her explanation for doing so is well supported and explained. She acknowledged the length the treating relationship; frequency and type of treatment administered; and the support ability and consistency of the opinion with the other evidence of records (Tr. 19-21); *Wilson*, at 544. As a threshold matter, the fact that no other physician completed an assessment of the work-related functions did not mandate  the ALJ adoption of Dr. Nedic's findings. *See Hensley*, 573 F.3d at 266 (controlling weight appropriate in instance that treating opinion supported by the clinical and objective studies and "not inconsistent with the other substantial evidence . . ."); *Cutlip v. Secretary of Health and Human Services,* 25 F. 3d. 284, 287 (6th Cir. 1994)("great weight" accorded to treating opinions "only . . .  when they

-16-

are supported by sufficient clinical findings . . ."). Although Plaintiff asserts that the ALJ improperly substituted her "lay opinion" in place of the opinion by an acceptable source, the ALJ did not err in rejecting the opinion in favor of substantial evidence drawn from the record as a whole. *Rudd v. Commissioner of Social Sec.*, 531 Fed.Appx. 719, 727–28 (6th Cir. September 5, 2013)(ALJ "properly based her RFC determination on all the evidence of record").

The ALJ did not err in noting that Dr. Nedic's opinion consisted of a "form statement" (Tr. 20). *See Hernandez v. Commissioner of Social Sec.*, 644 Fed.Appx. 468, 475 (6th Cir. March 17, 2016)("ALJ properly discounted" source's "check-box analysis" which was contradicted by other portions of the record). The ALJ observed that the report by Plaintiff's father that Plaintiff could walk one mile before requiring a rest grossly contradicted Dr. Nedic's finding that she was incapable of walking more than half a block (Tr. 21, 197, 430). While Plaintiff faults the ALJ for referring to Dr. Nedic's assessment as "somewhat overly sympathetic," (Tr. 20-21), "overly sympathetic" in this context appears to be synonymous with "unsupported," given the observation that Dr. Nedic's findings of extreme physical limitation were undermined by the report of Plaintiff's father.

Plaintiff also faults the ALJ for noting that Dr. Nedic lacked the "vocational qualifications to assess the effects" of the impairments on the ability to work. *Plaintiff's Brief* at 12. She argues that Dr. Nedic's assessment of her physical capabilities was wholly appropriate under § 416.927(a)(1) which defines a "medical opinion" to include statements

regarding the "physical or mental restrictions." *Id.*  Plaintiff is correct that Dr. Nedic's findings cannot be discounted simply on the basis that he assessed her work-related limitations.  However, the ALJ's statement, read along with the next sentence– "The determination of disability is, in any event, reserved to the Commissioner"– appears to refer specifically to Dr. Nedic's statement that Plaintiff was incapable of all work (Tr. 20, 431-432) as an issue reserved to the Commissioner rather than a basis for rejecting the assessment as a whole.  In any case, apart from the ALJ's (at worst) ambiguous statement, she complied with the procedural and substantive requirement of the treating physician analysis.

First, with nothing more, Dr. Nedic's own treating records undermine his finding that Plaintiff experienced disability level limitation.  His September, 2015 records note an unremarkable mental and physical examination (Tr. 564).  In February, 2016, he noted a normal appearance, gait, and mental condition (Tr. 526-527).  His July, 2016 records note that Plaintiff experienced only "muscle aches" but was extremely upset due to relationship problems (Tr. 473).  His November, 2016 records note Plaintiff's denial of migraines (Tr. 453).  His treating records include toxicology testing results but show that actual physical examinations, rarely performed, actual do not support his finding of disabling physical limitation.  The records do not refer to objective evidence supporting the allegations of disabling headaches and syncope.  The ALJ did not err in finding that Dr Nedic's assessment appeared to based almost wholly on Plaintiff's unsupported allegations.

Moreover, the remainder of the record, exhaustively recounted by the ALJ,

-18-

undermines Plaintiff's subjective complaints forming the basis of Dr. Nedic's disability opinion (Tr. 17-21).  While Plaintiff periodically referred to the enlarged pituitary gland as a "brain tumor," the condition was deemed asymptomatic (Tr. 354).  Treating records for the relevant period show that the symptoms of headache, nausea, and dizziness/syncope, even by Plaintiff's own account, were intermittent.  The headaches were diagnosed as muscle tension headaches and treated with over-the-counter medication (Tr. 424).  Plaintiff reported in July, 2014 that the headaches were stable and in October, 2014 denied nausea or fainting (Tr. 372).  While she reported "blackouts, dizzy spells, and headaches" the following month, (Tr. 357), none of the subsequent records note reports of fainting/syncope, contrary to her testimony that she passed out three to four times every day (Tr. 48).  July, 2016 records noting that Plaintiff reported dizziness while arising "quickly" suggest that the dizziness was limited to those occasions (Tr. 586).   Plaintiff's January, 2017 that she was able to go out with friends to meet her former boyfriend undermines her claim that she was housebound by constant headaches, nausea,  dizziness, and fainting spells (Tr. 615).

### B.  The Report by Plaintiff's Father

Plaintiff cites her father's November, 2014 third party report that she "'passes out, blacks out, [has] dizzy spells all the time,'" and "'walks unbalanced a lot,'" arguing that the ALJ failed to acknowledge her father's statements regarding the functional limitations. *Plaintiff's Brief* at 20-21 (*citing* Tr. 192).  Plaintiff cites SSR 06–3p which directs that the ALJ must consider evidence from "other," non-medical sources such as family members or

friends whose observations may be helpful in developing an assessment of a claimant's limitations. *Id.*; 2006 WL 2329939, at *6 (August 9, 2006).

Plaintiff's claim that the ALJ did not "consider" her father's statements is directly contradicted by the ALJ's multiple citations to Robert D. Hayes' ("Hayes'") report. The ALJ noted Hayes' report that Plaintiff did not follow instructions well and required medication for anxiety and to help her sleep (Tr. 15, 197, 199).  The ALJ cited Hayes' report to support her finding that Plaintiff experienced moderate limitation in understanding, remembering, or applying information (Tr. 14-15).  The ALJ cited Hayes' report a second time by noting that his finding that Plaintiff had a short attention span but could perform household chores with encouragement supported a finding of moderate concentrational limitation (Tr. 15, 194). Thus, the ALJ not only considered Hayes' report but adopted it in part.

The ALJ permissibly noted that Hayes' report in part undermined the allegations of disability, remarking that Hayes' statement that Plaintiff could walk up to one mile before requiring a rest grossly contradicted Dr. Nedic's opinion (and Plaintiff's testimony) that she was incapable of walking more than half a block at one time (Tr. 21, 43, 197, 430). Plaintiff's contention that the was also required to adopt the portions of Hayes' report describing allegedly disabling limitation is without merit.  "'The fact that the ALJ is required to consider . . . third-party statements does not mandate that the ALJ adopt them ...'" *Shipman v. Commissioner of Social Security*,  271 F.Supp.3d 899, 908   (E.D. Mich. 2017)(citing *Shelton v. Colvin*, 2015 WL 5569024, *17 (W.D. Okla. Aug. 24, 2015)) *report*

*and recommendation adopted*, 2015 WL 5579803 (W.D. Okla. Sept. 22, 2015).

In closing, the recommendation to uphold the ALJ's findings should not be read to trivialize the difficulties overcoming Plaintiff's former substance abuse or appreciable situational stressors. However, because the determination that she was not disabled is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons,  I recommend that Defendant's Motion for Summary Judgment [Docket #22] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #19] be DENIED.

Any objections to this Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

<div style="margin-left: 40%;">

s/ R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

</div>

Dated: February 20, 2019

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was sent to parties of record on February 20, 2019, electronically and/or by U.S. mail.

<div style="margin-left: 40%;">

s/Carolyn M. Ciesla
Case Manager to the
Honorable R. Steven Whalen

</div>